**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-22705-CIV-ALTONAGA/Reid**

**LESLEY TRACY HARRIS**,

      Plaintiff,

v.

**L. GUERTIN**, *et al.*,

      Defendants.

_____/

**ORDER**

**THIS CAUSE** is before the Court on Plaintiff, Lesley Tracy Harris's Motion for Summary

Judgment ("Plaintiff's Motion") [ECF No. 368]; and the Wexford Defendants' Omnibus Motion

for Summary Judgment ("Defendants' Motion") [ECF No. 388].[1]  Defendants filed a Response to

Plaintiff's Motion [ECF No. 389], to which Plaintiff filed a Reply [ECF No. 449].  Plaintiff also

filed a Response to Defendants' Motion [ECF No. 444].  The Court has carefully considered the

Amended Complaint [ECF No. 46], the parties' written submissions,[2] the record, and applicable

law.  For the following reasons, Plaintiff's Motion is denied, and Defendants' Motion is granted.

---

[1] The Wexford Defendants include: Lisa Guertin, P.A.; Jose Santiero, M.D.; Katherine Heath, P.A.; Lourdes Selem, M.D.; Carmelo Berrios, M.D.; Jose Bermudez, M.D.; Christopher Vigueras, R.N.; Andre Rivero-Guevara; Marissa Gonzalez; and Jorge Delgado, M.D. (collectively, "Defendants" for purposes of this Order).  (*See* Defs.' Mot. 1).  The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

[2] The parties' factual submissions include: the Wexford Defendants' Expert Witness Report ("Expert Rep.") [ECF No. 295-1]; Plaintiff's Response to Wexford Defendants' Expert Witness Report ("Pl.'s Resp. to Expert Rep.") [ECF No. 370]; Plaintiff's Nunc Pro Tunc Supplement to Plaintiff's Response to Defense Expert Report ("Suppl. Med. Recs.") [ECF No. 374-1]; the Wexford Defendants' Statement of Material Facts in Support of their Omnibus Motion for Summary Judgment ("Defs.' SOF") [ECF No. 387]; the Affidavit of Dr. Michael Moreno ("Moreno Aff.") [ECF No. 387-1]; Seroquel Package Leaflet: Information for the User ("Seroquel Leaflet") [ECF No. 387-3]; the Wexford Defendants' Notice of Filing Documents Under Seal ("Med. Recs.") [ECF No. 405-1]; Plaintiff's Affidavit of Seroquel Case Study ("Pl.'s Case Study Aff.") [ECF Nos. 444-2, 449-2]; the Affidavit of Joseph B. Collins ("Collins Aff.") [ECF Nos. 444-3, 449-3]; the Affidavit of Steven Kirkpatrick ("Kirkpatrick Aff.") [ECF Nos. 444-4, 449-4]; the Affidavit

## I.  BACKGROUND

On July 10, 2017, Plaintiff filed suit against Defendants, alleging violations of the Eighth Amendment's prohibition on cruel and unusual punishment.  (*See* Compl. [ECF No. 1]).  He contends Defendants were deliberately indifferent to his serious medical needs by discontinuing his Seroquel, an antipsychotic medication, and failing to adequately treat his rashes and lesions, which he claims developed as a result of no longer taking Seroquel.  (*See* Am. Compl. 8, 13; *see generally* Pl.'s Mot.).

Plaintiff's troubles began on May 29, 2015, when he was transferred to Everglades Correctional Institution and discontinued from Seroquel.  (*See* Pl.'s Am. SOF ¶ 1; Pl.'s Resp. SOF ¶ 4; Defs.' SOF ¶ 4).  Plaintiff's Drug Exception Request ("DER") for Seroquel had been granted at his prior institution (*see, e.g.*, Med. Recs. 37); but at a meeting with Plaintiff on June 2, 2015, Defendant Guertin explained the prior institution "was run by a different company" so she would need to file a new DER request (*id.* 13).  She cautioned Plaintiff there was "no guarantee of approval" and noted he was stable and "verbalized understanding."  (*Id.*).  Guertin submitted a DER for Seroquel, stating she was requesting the nonformulary drug because, "on most other antipsychotics[,]" Plaintiff reported he developed tardive dyskinesia — a condition characterized by involuntary movements.  (*Id.* 50 (alteration added)).  Defendant Santiero, who served as Lead Psychiatrist, denied the DER on June 5, 2015, commenting "[Y]ou must send dates [and] duration of other[] [medications]."  (*Id.* (alterations added)).

---

of Robert Mackey ("Mackey Aff.") [ECF Nos. 444-5, 449-5]; Plaintiff's Affidavit of Pain in Support of Plaintiff's Motion for Summary Judgment in Favour [sic] of Plaintiff ("Pl.'s Pain Aff.") [ECF No. 445]; Plaintiff's Amended Rebuttal/Response/Opposition to Wexford Defendants' Statement of Material Facts in Support of their Omnibus Motion for Summary Judgment ("Pl.'s Resp. SOF") [ECF No. 447]; and Plaintiff's Amended Statement of Material Facts in Support of Plaintiff's Amended Cross-Motion for Summary Judgment in Favour [sic] of Plaintiff ("Pl.'s Am. SOF") [ECF No. 450].

On June 8, 2015, Guertin met with Plaintiff for a psychiatric follow-up.  (*See* Suppl. Med. Recs. 14).  Plaintiff told Guertin, "I want you to appeal the DER and file another because I want my Seroquel.  I can't take anything else."  (*Id.* (quotation marks omitted)).  Guertin noted that although Plaintiff reported hallucinations "all of the time[,]" he was adequately groomed and dressed, cooperative, calm, alert, oriented, and maintained good eye contact.  (*Id.* (alteration added; quotation marks omitted)).

Guertin again met with Plaintiff on June 10, 2015, when he complained, "I haven't had my Seroquel in [two] w[ee]ks."  (Med. Recs. 53 (alterations added; quotation marks omitted)).  Plaintiff appeared adequately groomed and dressed, but he was "agitated[,]" angry, irritable, and "yelling[.]"  (*Id.* (alterations added)).  Guertin wrote that Plaintiff was "very agitated because his Seroquel DER was denied.  I personally read all volumes of his chart and noted that he tolerated Risperdal, which I offered him.  He stated that he can't take Risperdal.[3]   [He] [a]lso stated that he cannot sleep [without] Seroquel[,] which I explained is not a sleep med[ication]."  (*Id.* 54 (alterations added)).  Guertin continued, "[Plaintiff] is writing notes and grievances[,] but the DER was refused and he refuses any other antipsychotic. . . .  P[laintiff] is being manipulative [and] is med[-]seeking.  This is becoming a behavioral issue."  (*Id.* (alterations added)).  Guertin prescribed Plaintiff Vistaril to treat his anxiety.  (*See id.*).

On June 15, 2015, Plaintiff submitted an Inmate Request for Seroquel, asserting he was not being adequately treated for his psychosis.  (*See id.* 34).  Guertin responded to the complaint the following day: "Your chart reflects that you tolerated Risperdal with Cogentin which has been

---

[3] Plaintiff asserts "Risperd[a]l almost killed [him]" (Pl.'s Am. SOF ¶ 4; *see also* Suppl. Med. Recs. 174 (noting Plaintiff experienced "significant [extrapyramidal symptoms]" while taking Risperdal (alteration added)), but the document he cites contains no indication Plaintiff experienced adverse side effects taking Risperdal with Cogentin, as he was offered by Guertin.

offered to you[,] but you have continued to refuse it.  Therefore, you are refusing care and treatment.  The DER for Seroquel was denied." (*Id.* (alteration added)).

Plaintiff met Guertin again on June 22, 2015, accusing her of "trying to kill [him]." (*Id.* 51 (alteration added; quotation marks omitted)).  He "remain[ed] insistent . . . that his DER for Seroquel should be approved" and denied "his chart reflects that he took Risperdal [and] Cogentin [without] any problems[.]" (*Id.* 52 (alterations added)).  Plaintiff "scream[ed]" at Guertin "that [she] was trying to kill him[,]" "demand[ed] a DER for Seroquel[,] and refuse[d] Risperdal." (*Id.* (alterations added)).  Guertin observed that Plaintiff "d[id] not appear to be responding to internal stimuli" and made "Dr. Johnson [] aware of [the] current situation." (*Id.* (alterations added)).

On June 24, 2015, Plaintiff submitted a sick-call request, stating he was "willing to risk taking Risperdal." (Suppl. Med. Recs. 18).  The following day, Dr. Johnson, a Senior Mental Health Clinician and Licensed Psychologist, administered the Miller Forensic Assessment of Symptoms ("MFAST") to Plaintiff. (*See* Defs.' SOF ¶ 10).  Dr. Johnson observed Plaintiff's "chief concern [throughout treatment] has been to receive Seroquel, which he states he needs for various symptoms.  The medical record, however, shows . . . inconsistent and apparently exaggerated symptoms to which a MFAST evaluation was ordered." (Med. Recs. 32 (alterations added)).

Plaintiff scored a 13 out of 25 on the MFAST.[4] (*See id.*).  Dr. Johnson explained any score above 6 "suggests that [he] may be feigning or exaggerating [mental health] symptoms . . . , perhaps to obtain the psychiatric medication he demands." (*Id.* (alterations added)).  The high score was especially noteworthy to Dr. Johnson because Plaintiff stated, "he was aware the test was for malingering." (*Id.*).  Dr. Johnson cautioned Plaintiff's "diagnosis [of schizoaffective disorder] should be carefully reviewed and modif[ied] should [he] not meet formal diagnostic

---

[4] Plaintiff asserts he saw Dr. Johnson record answers "he did not give" during the evaluation, but he states he "does not oppose the contents of th[e] document." (Pl.'s Resp. SOF ¶ 10 (alteration added)).

criteria[,]" and stated Plaintiff "d[id] not appear eligible for a DER for Seroquel at this time." (*Id.* (alterations added)).

In early July 2015, Plaintiff submitted two Inmate Requests to Guertin, seeking Risperdal and complaining about Dr. Johnson. (*See* Suppl. Med. Recs. 19, 175). Guertin responded that Plaintiff had already received a response regarding Risperdal and informed him Defendant Rivero-Guevara would provide future care. (*See id.*). On August 12, 2015, Plaintiff filed a grievance concerning the denial of medication, alleging Rivero-Guevara refused to prescribe him Risperdal because his chart showed all medications offered at Everglades were "dangerous" to him. (*Id.* 20). Rivero-Guevara and Assistant Warden K. Scott denied the grievance, explaining:

> [Y]our entire chart was reviewed; at no time during the review was it noted that you experienced any serious side effects or complications related to antipsychotic medication. In fact, the records reflect that you took Risperdal and Congentin [sic] with a positive response for periods of greater than six [] months. A DER was denied by Dr. Santiero for Seroquel who asked for dates and medications that you could not tolerate[;] however, since no evidence could be found[,] a second DER was never filed.
>
> Furthermore, an M-FAST test was administered by Dr. A. Johnson on [June 25, 2015] whereby she noted that you scored a 13/25. It has been determined that you do not require antipsychotic medication at this time.

(*Id.* 13 (alterations added)).

Plaintiff saw Rivero-Guevara on August 18, August 31, and September 1, 2015. (*See* Med. Recs. 46, 55–57). At those meetings, Plaintiff threatened to hurt himself, Guertin, and Rivero-Guevara. (*See id.*). He "demand[ed] Seroquel" and indicated he would "continue to cause self and institutional disturbance[s]" if his demands were not met. (*Id.* 16 (alterations added)). Staff therefore placed Plaintiff in a self-harm observation unit, noting he "feign[ed] psychiatric symptoms" and "manipulate[d] staff with . . . threats" in order to obtain Seroquel. (*Id.* (alterations added)).

5

Around the same time, on August 7, 2015, Plaintiff complained he had developed a rash on his arms and legs, which he stated was "coming out from his lymph nodes." (*Id.* 1). Medical staff prescribed Plaintiff Benadryl tablets and a hydrocortisone cream. (*See id.*). Plaintiff was again seen by medical staff on August 13, 2015 for itching and was prescribed hydrocortisone cream and Bacitracin ointment. (*See id.* 45). On September 9, 2015, after he was transferred to the South Florida Reception Center ("SFRC"), Plaintiff presented with a six-by-eight-centimeter lesion on his abdomen and was diagnosed with dermatitis. (*See id.* 17). He was treated with an antihistamine. (*See* Pl.'s Resp. SOF ¶ 14).

On September 9, 2015, Plaintiff was also seen for a psychiatric evaluation. (*See* Med. Recs. 18). He displayed no signs or symptoms of psychosis, depression, or mania; but he acted defiant and oppositional toward staff. (*See id.*). Medical staff noted Plaintiff was "med-seeking for Seroquel[,]" but found "no justification for this med." (*Id.* (alteration added)).

Plaintiff was subsequently administered a second MFAST examination by Dr. L. Palmer on September 21, 2015. (*See id.* 19). After scoring a 25 out of 25 — a score indicating malingering — Plaintiff claimed he had intentionally "lied on every question" and "continued to argue that he require[d] Seroquel[.]" (*Id.* (alterations added)).[5] Dr. Palmer concluded neither his "clinical presentation nor his M-FAST scores indicate he is experiencing psychotic symptoms." (*Id.*).

Plaintiff again demanded Seroquel at a psychiatric follow-up on October 5 (*see* Suppl. Med. Recs. 25), a request Santiero denied (*see* Pl.'s Am. SOF ¶ 12). Plaintiff states Santiero offered him Risperdal instead, but refused to review Plaintiff's medical charts to confirm

---

[5] Plaintiff states he "answered every question opposite, and at the end [he] said, 'Now turn every 'yes' to a 'no' and every 'no' to a 'yes' so instead of all 25 wrong, I got all 25 right[.]'" (Pl.'s Resp. SOF ¶ 15 (alterations added)).

Plaintiff's allegation that he could not tolerate it.  (*See id.*).  Plaintiff was seen by mental health staff at the SFRC on two more occasions.  (*See* Suppl. Med. Recs. 22–23).

On October 3, 2015, Plaintiff complained of itching and requested Benadryl.  (*See* Med. Recs. 47).  Aside from an "old scab," Nurse Louissaint observed no skin irregularities.  (*Id.*).  Nurse Warring saw Plaintiff on October 16, 2015 for itchy skin due to an unknown source and prescribed CPM[6] to ease his itching.  (*See id.* 59–60, 62).

On October 22, 2015, Plaintiff was transferred to Dade Correctional Institution.  (*See* Suppl. Med. Recs. 26; Pl.'s Resp. SOF ¶ 4).  From October 29, 2015 through January 7, 2016, Plaintiff was seen a total of six times by mental health and psychiatric staff.  (*See* Suppl. Med. Recs. 29–35).  He consistently complained about the denial of Seroquel, but at each session, staff noted he did not appear to be responding to internal stimuli, had coherent conversations inconsistent with his reports of hearing voices, and made contradictory claims of psychotic illness and having a high IQ.  (*See id.*).  Accordingly, on January 7, 2016, Defendant Heath downgraded Plaintiff's mental health status from S3 to S2.  (*See id.* 35).

During this period, Defendant Bermudez, Senior Psychologist, also denied Plaintiff's December 21, 2015 grievance concerning rescheduled mental health appointments and denial of medication.  (*See id.* 36).  He observed Plaintiff had been seen by psychiatry staff on December 10 and would be seen again shortly.  (*See id.*; *see also id.* 32).  Plaintiff was next seen by psychiatry staff on December 28, 2015.  (*See id.* 33).

On December 10, 2015, Plaintiff presented with a chief complaint of an itch in his groin area, requesting Tolnaftate and hydrocortisone cream.  (*See* Med. Recs. 49).  He told Nurse Hightower he had last experienced similar itchiness two months before.  (*See id.*).  Nurse

---

[6] CPM and CTM both refer to chlorpheniramine, an antihistamine.  The Court uses them interchangeably, in accordance with the acronym used in the relevant cited material.

Hightower observed no rashes or lesions in Plaintiff's groin area (*see id.*), but nevertheless gave him Tolnaftate for treatment (*see* Pl.'s Resp. SOF ¶ 18).  Plaintiff was also prescribed CPM on December 14, 2015.  (*See* Suppl. Med. Recs. 28).

In late January 2016, he was prescribed Benadryl and triamcinolone ointment to ease his itching.  (*See id.* 41).  Plaintiff was seen for the same complaint of itchy skin on February 5, February 11, and February 29, 2016.  (*See* Med. Recs. 2–4; *see also* Suppl. Med. Recs. 42, 45–46).  During each visit, Nurses James and Hightower noted no rashes or lesions,[7] and Plaintiff indicated he was not in pain.[8]  (*See* Med. Recs. 2–4).  He first indicated he had been experiencing the problem "for years" (*id.* 3[9]), and later said he had been itching for "five months straight" (Suppl. Med. Recs. 45).  At each visit, Plaintiff was prescribed hydrocortisone cream and Benadryl, which he stated had effectively treated his itching in the past.  (*See* Med. Recs. 2, 4; Suppl. Med. Recs. 28, 42, 49).

Plaintiff then saw Defendant Berrios on March 10, 2016.  (*See* Med. Recs. 5).  Plaintiff explained to Berrios that he had not been using Seroquel for over six to eight months and was now persistently itchy.  (*See id.*).  Berrios observed "multiple abrasions" on Plaintiff's body and assessed his symptoms as "pruritus, secondary to Seroquel."  (*Id.*).  Plaintiff was prescribed 15 days of Benadryl and 10 days of prednisone for treatment.  (*See id.*; Suppl. Med. Recs. 50).  Berrios

---

[7] Plaintiff states his itching condition is "nocturnal" such that he has visibly "oozing hives at night, but only the scabs would remain in the day[.]"  (Pl.'s Resp. SOF ¶ 21 (alteration added)).

[8] Plaintiff disputes that his condition is not painful (*see generally* Pl.'s Pain Aff.), and he clarifies that he simply "denied pain at that moment" (Pl.'s Resp. SOF ¶ 19 (emphasis omitted)).

[9] Plaintiff submits Nurse James's notation that Plaintiff said he had experienced this issue "for years" was a misinterpretation.  (Pl.'s Resp. SOF ¶ 20 (quotation marks omitted)).  He insists he told Nurse James the itching had been ongoing since 2015 and that he had developed the same condition when he was discontinued from Seroquel in or around 2012.  (*See id.*).

indicated he would consult with mental health staff to determine if the itching was psychological. (*See* Pl.'s Am. SOF ¶ 18).

Plaintiff submitted several grievances throughout February and March 2016 relating to the discontinuation of Seroquel and treatment for his itching.  (*See* Med. Recs. 42–43; Suppl. Med. Recs. 37–40, 51–54).  Bermudez, Berrios, and other staff denied the grievances, responding that the psychiatry staff determined he did not need antipsychotic medication at that time, he had appointments scheduled with his counselor to discuss his mental health issues, and requests for itching medications should be submitted through sick-call requests.  (*See generally id.*).  Plaintiff continued to write grievances throughout April 2016, which were denied as duplicative of previously addressed grievances and because Plaintiff was already scheduled for the appointments he had requested.  (*See* Suppl. Med. Recs. 55–59, 71–72).

On April 12, 2016, Plaintiff was seen by Bermudez, Defendant Selem, and Counselor Carol de la Cruz.  (*See* Med. Recs. 35).  He expressed frustration that he was not seen by mental health staff in the time frame he wanted and stated that he wanted psychotropic medication.  (*See id.*).  Plaintiff reported he "had bad side effects with Risperdal" and stated it was now "documented" that he has an allergic reaction secondary to Seroquel.[10]  (*Id.*).  Selem explained that Plaintiff did not need psychotropic medications at that time, informed him he needed to work with medical

---

[10] Plaintiff submits these statements are evidence Selem and Bermudez offered him Risperdal at this meeting (*see* Pl's Resp. SOF ¶ 23), but the medical record merely affirms that Plaintiff reported having "bad side effects" while taking Risperdal (Med. Recs. 35).  Nothing in the document suggests these Defendants offered Plaintiff Risperdal; in fact, the document specifically reiterates that "[p]sychotropic medications are not needed at this [t]ime."  (*Id.* (alterations added)).  Plaintiff also places great emphasis on Bermudez's notation that Plaintiff's allergic reaction secondary to Seroquel "is documented[,]" which Plaintiff construes as affirmation of his requested diagnosis that discontinuing Seroquel caused his itching condition.  (Pl.'s Resp. SOF ¶ 23 (alteration added)).  However, Plaintiff conveniently omits the beginning proposition: that Plaintiff simply "reported" it was now "documented" he had an allergic reaction secondary to Seroquel.  (Med. Recs. 35).  Thus, contrary to Plaintiff's assertions, Bermudez's notation plainly does not "affirm" Plaintiff's theories or claims in this action.

staff to address his medical issues, and indicated she would discuss the case with Berrios the following day. (*See id.*). Bermudez noted Plaintiff was alert and oriented at the meeting, his thinking clear and goal-directed, and his mood irritable and frustrated. (*See id.*). Plaintiff evinced no sign of hallucinations and was informed he would be seen by mental health staff as scheduled. (*See id.*).

On April 20, 2016, Plaintiff saw Defendant Delgado concerning his complaints of generalized itching. (*See id.* 6). Delgado observed scratches from itching on Plaintiff's lips and arms and diagnosed Plaintiff with neurodermatitis. (*See id.*). Plaintiff refused triamcinolone but was prescribed Benadryl for 30 days, prednisone for 20 days, and Selsun Blue shampoo for 30 days to reduce itching.[11] (*See id.*; Suppl. Med. Recs. 60–61). Plaintiff's prescriptions ended on May 22, 2016. (*See* Med. Recs. 6).

On May 24, 2016, Plaintiff complained to Berrios that he experienced persistent itching if he was not taking Benadryl. (*See* Suppl. Med. Recs. 77). Berrios noted no lesions on Plaintiff's skin and referred him to mental health for evaluation as to whether his itching was associated with a "chronic" psychological disorder. (*Id.*). Berrios did not prescribe Benadryl to Plaintiff at that time. (*See id.*).

A few days later, Plaintiff submitted a grievance requesting the continuation of Benadryl. (*See id.* 188–90). He opined that his itching "[wa]s *not* a withdrawal from Seroquel," but "a medical condition [that] was hiding because it was being treated by a psyche med that happened to help." (*Id.* 188 (alterations and emphasis added; underlining and capitalization omitted)). He stated Defendant Vigueras saw "red splotches and welts" on Plaintiff's skin on May 26 and

---

[11] Although Delgado noted "Benadryl helps" (Defs.' SOF ¶ 24), Plaintiff insists he told Delgado, "Benadryl barely takes the edge off the itching and does not help the pain" (Pl.'s Resp. SOF ¶ 24 (quotation marks and bold omitted)).

commented that the condition looked like hives.  (*Id.*).  Berrios denied the grievance, advising Plaintiff he had an upcoming appointment concerning a Benadryl prescription.  (*See id.* 190).

Berrios next saw Plaintiff on June 7, 2016.  (*See* Med. Recs. 61).  Plaintiff "report[ed] that his itching ha[d] relieved, but he [still] says he needs his Benadryl" to prevent his itch.  (*Id.* (alterations added)).  Berrios observed a normal skin color and no jaundice, purpura, or unusual pigmentation, which led him to suspect Plaintiff had psychogenic pruritus — a psychologic impulse to itch in the absence of a dermatologic cause.  (*See id.*).  Berrios ordered lab testing, referred Plaintiff to mental health, and prescribed CPM for 15 days.  (*See id.*; Suppl. Med. Recs. 78).  On June 25, 2016, Berrios again observed no abnormalities on Plaintiff's skin and suspected psychological or psychosomatic itching.  (*See* Med. Recs. 7).  He referred Plaintiff to mental health and prescribed him CPM.  (*See id.*).

 Plaintiff was seen by mental health staff on June 30 and July 14, 2016.  (*See id.* 8).  On July 22, 2016, Berrios recorded on Plaintiff's chart that he had been evaluated by mental health and reiterated his desire for Seroquel.  (*See id.*).  Berrios wrote: "Patient still feels mild[ly] anxious and[,] due to his anxious state[,] feels itchy all around."  (*Id.* (alterations added)).  He suspected psychogenic itching as well as general anxiety disorder and prescribed Benadryl for 30 days.  (*See id.*; Suppl. Med. Recs. 80).  On August 25, 2016, Plaintiff's prescription for Benadryl was renewed for another 30 days, in addition to ibuprofen, vitamin D3, Claritin, and Bacitracin ointment.  (*See* Suppl. Med. Recs. 80).

On September 9, Plaintiff reported the Claritin and Benadryl somewhat eased his itching, but the itching was getting worse and "migrating" to different parts of his body.  (*Id.* 81).  Thus, Plaintiff was seen by Delgado on September 19.  (*See id.* 82).  Delgado noted several lesions on

Plaintiff's body and "a lot of scratches."[12]   (*Id.*).   He diagnosed Plaintiff's condition as neurodermatitis and ordered a biopsy of the lesion (*see id.*), which came back on September 30, 2016 as "consistent with secondary excoriation" (Med. Recs. 25 (capitalization omitted)).  Delgado prescribed triamcinolone cream containing the alcohol Plaintiff believed would help, Bacitracin, and Claritin for 3 weeks.  (*See* Suppl. Med. Recs. 82).  He also noted there should be a follow-up appointment in 3 weeks to discuss the results of the biopsy.  (*See id.*).

On September 18, 2016, Plaintiff submitted a grievance addressed to the mental health unit, complaining he had been offered Risperdal in April 2016 but denied "[his] medication."  (*Id.* 177–78 (alteration added)).  Bermudez denied the grievance, explaining Plaintiff was "receiving treatment, [which] does not automatically mean you must be prescribed medication."  (*Id.* 177 (alteration added)). Selem saw Plaintiff for a psychiatric visit on October 10, 2016 during which Plaintiff repeated his request for Seroquel (*see id.* 172); mental health staff saw Plaintiff on October

---

[12] Regarding this time period, Plaintiff submits an affidavit from Steven Kirkpatrick, a fellow inmate who was bunked near Plaintiff.  (*See generally* Kirkpatrick Aff.).  Kirkpatrick states he noticed "open[,] bleeding sores" on Plaintiff's body in the summer of 2016 and witnessed him scratching his arms and legs at night. (*Id.* 1 (alteration added)).  According to Kirkpatrick, Plaintiff told him the medications he had been given were not helping, that medical staff refused to treat him, and he believed his itching stemmed from the discontinuation of Seroquel.  (*See id.*).

While the Court considers Kirkpatrick's attestations that he witnessed Plaintiff itching, the statements Plaintiff purportedly made to Kirkpatrick are hearsay and not made on Kirkpatrick's personal knowledge. *See* Fed. R. Evid. 801(c); *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("[I]nadmissible hearsay cannot be considered on a motion for summary judgment." (alteration added; quotation marks, footnote call number and citation omitted)); Fed. R. Civ. P. 56(e)(1).  Even if some exception to the hearsay rule could reasonably apply to admit such attestations written a year and a half after Plaintiff made the alleged statements, or the statements could be "reduced to an admissible form[,]" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (alteration added; quotation marks and citation omitted), the Court disregards conclusory allegations unsupported by specific facts, *see James v. City of Montgomery*, 823 F. App'x 728, 731 (11th Cir. 2020).  The Court therefore does not consider Plaintiff's conclusory statements to Kirkpatrick that medical staff refused to treat him and the cessation of Seroquel caused his itching condition.  However, assuming the statement qualifies as a present-sense impression or a statement of Plaintiff's then-existing sensory or physical condition, *see* Fed. R. Evid. 803(1), (3), the Court will consider Plaintiff's report to Kirkpatrick that the prescribed medications were not easing his itching.

13, November 11, and December 9, 2016 (*see id.* 181–83).  During this time, Selem completed a comprehensive review of Plaintiff's psychiatric records and complaints.  (*See id.* 180).  Upon receipt of another grievance, Berrios explained to Plaintiff he does not see the psychiatrist regularly because he is "a psych level 2[.]"  (*Id.* (alteration added)).

On October 25, 2016, Plaintiff declared a medical emergency because his condition had spread to his genitalia.  (*See* Pl.'s Am. SOF ¶ 23).[13]  Vigueras refused to "pull out" and evaluate Plaintiff's genitalia, but instead went to speak with Berrios.  (*Id.*).  He returned and relayed Berrios's instruction to Plaintiff to "[p]ut in a sick call."  (*Id.* (alteration added; quotation marks omitted)).  One week later, Nurse James evaluated Plaintiff and "gave him a shot of Benadryl." (*Id.* ¶ 23a).

On November 11, 2016, Plaintiff reported "excruciating itching . . . , specifically in the groin area[.]"  (Med. Recs. 9 (alterations added)).  Delgado noted excoriations on Plaintiff's anterior torso as well as his thigh and groin area, but observed his back was "clean where he can't reach skin."  (*Id.*).  Delgado explained the findings of the biopsy report, which indicated excoriation or skin-picking; and he diagnosed Plaintiff with neurodermatitis, anxiety, and excoriation.  (*See id.*).  He also noted Plaintiff's history indicated hepatitis C, which is associated with pruritus.  (*See id.*).  Delgado described Plaintiff as "very anxious" and "reluctant to accept diagnosis."  (*Id.*).  He prescribed CTM for 30 days, Selsun Blue, triamcinolone, and prednisone for 29 days.  (*See id.*).

---

[13] Plaintiff submits an affidavit from another fellow inmate, Robert Mackey, who asserts he saw Plaintiff report to the medical unit on October 25, 2016 for "open wounds and lesions[.]"  (Mackey Aff. 1 (alteration added)).  In relevant part, Mackey simply avers Plaintiff was sent to "emergency medical" (*id.*); he does not state any pertinent information about the medical care Plaintiff received on that date.  Further, Mackey's attestations that Plaintiff told him medical staff would not give him Seroquel, despite knowing Seroquel "[w]as the only cure[,]" are inadmissible hearsay and conclusory in nature.  (*Id.* (alterations added)).  Thus, the Court does not consider them.  Finally, Mackey's statements about Plaintiff's mistreatment by correctional officers are irrelevant to Plaintiff's claims against the Wexford Defendants.

Plaintiff returned to the emergency department with identical complaints on November 14, 2016, telling Delgado his itching was "due to Seroquel" being discontinued for him in May 2015. (*Id.* 10). Delgado confirmed his earlier diagnosis, notated "pathological behavior[,]" prescribed Bacitracin and Keflex, and instructed Plaintiff to avoid scratching his skin. (*Id.* (alteration added)). The next day, Plaintiff again reported to the medical clinic with multiple red, plaque-like lesions on his skin; but Nurse James observed no markings on his back, no pustules, and no drainage. (*See id.* 11). Nurse James suspected psoriasis and prescribed Hibiclens shower gel, Benadryl, and for Plaintiff to continue all other medications prescribed by Delgado. (*See id.*). Plaintiff agreed to the treatment plan. (*See id.*).

On November 28, 2016, Plaintiff approached Delgado demanding medication, threatening litigation, and refusing to accept Delgado's diagnosis that his itching was psychological. (*See id.*). Delgado noted how frequently Plaintiff had been seen in the month of November and that he had been prescribed eight different medications that month.[14] (*See id.*). Plaintiff also received CTM over the counter that day. (*See id.*).

Two days later, Plaintiff declared an emergency, but Vigueras refused to treat Plaintiff or retrieve a doctor. (*See* Pl.'s Am. SOF ¶ 26). After Plaintiff returned to the mental health unit and declared his second psychological emergency of the day, mental health staff accompanied Plaintiff to the medical unit and persuaded Berrios to evaluate Plaintiff. (*See id.*). Berrios, suspecting possible erythema multiforme, prescribed Plaintiff Benadryl, prednisone, Solu-medrol,

---

[14] Plaintiff asserts he waited two hours to see Delgado. (*See* Pl.'s Am. SOF ¶ 25). When he saw Delgado leaving for the day, Plaintiff "pleaded" with him for additional medication. (*Id.*). Delgado did not examine him at that time and told Plaintiff he did not need to be seen. (*See id.*). The Court finds Plaintiff's account to be consistent with Delgado's medical notes from that date, and the Court considers both.

Augmentin, Rocephin, and several other medications. (*See* Suppl. Med. Recs. 89–92). He also placed Plaintiff in the infirmary for 23-hour observation and ordered another biopsy. (*See id.*).

On December 1, 2016, Berrios prescribed Plaintiff petrolatum to apply to his wounds, Zantac, prednisone, and Benadryl. (*See id.* 93). The second biopsy results were received on December 6 and were consistent with a diagnosis of "picker's nodules" — lesions produced by repetitive scratching. (*Id.* 96).

The next day, Plaintiff reported Benadryl was not working and the only medication easing his itching was CTM. (*See id.* 94). He was prescribed triamcinolone cream for 30 days, Hibiclens shower gel for 30 days, CTM for 60 days,[15] and dibucaine ointment for 60 days; and he was referred to a dermatologist at the next available clinic. (*See id.* 94–96). Nurse James explained the care plan to Plaintiff and wrote, the "information needs reinforcing." (*Id.* 94).

On December 20, 2016, Plaintiff was approved for an outside consultation with a dermatologist, whom he saw on January 9, 2017. (*See id.* 96–97). Berrios did not provide medication upon Plaintiff's return from the dermatologist that day. (*See* Pl.'s Am. SOF ¶ 32).

On January 19, 2017, while awaiting the dermatology report, Berrios gave Plaintiff 18 CPM for his symptoms and "wrote a pass for him to get CPM at [the] infirmary" until the medications from the dermatological visit were received. (*Id.* ¶ 33 (alteration added)). On January 24, 2017, Berrios summarized the results of the dermatology report on Plaintiff's medical chart. (*See* Suppl. Med. Recs. 101). The report's results were consistent with the suspected condition of "picker's nodules," and Plaintiff was prescribed permethrin cream, clobetasol ointment, hydrocortisone cream, and Vistaril. (*Id.* 100–01). If his symptoms did not improve in four weeks,

---

[15] Plaintiff asserts this "was a lie" because the "nurses checked [his] chart" (Pl.'s Am. SOF ¶ 31 (alteration added)), but the medical evidence submitted by Plaintiff reveals he was in fact prescribed CTM for 60 days on December 7, 2016 (*see* Suppl. Med. Recs. 94–95).

the dermatologist recommended Plaintiff be scheduled to see a neurologist. (*See id.* 99, 101). Berrios ordered the prescriptions that day. (*See* Pl.'s Am. SOF ¶ 34).

During this period, mental health staff saw Plaintiff on January 6 (*see* Suppl. Med. Recs. 97, 184), and Bermudez administered another MFAST on January 12, 2017 (*see id.* 171). Based on a total score of 1, Bermudez concluded there did "[n]ot appear [to be] an indication that he was malingering, but . . . [t]here was no evidence of hallucinations or delusions." (*Id.* (alterations added)). Bermudez told Plaintiff he would "[b]e seen by mental health as scheduled" and would "continue to be observed and evaluated." (*Id.* (alteration added)). If staff determined it was necessary, he would be scheduled for a psychiatric evaluation. (*See id.*).

On January 31, 2017, Berrios gave Plaintiff 6 CPM pills. (*See* Pl.'s Am. SOF ¶ 36). The next day, Plaintiff declared a medical emergency complaining the medications prescribed by the dermatologist were "known to be ineffective[.]" (*Id.* ¶ 37 (alteration added)). Plaintiff waited two and a half hours to see Berrios, who denied Plaintiff additional medication and instructed him to put in a sick call. (*See id.*). Plaintiff submits Berrios should have written a new prescription or given him CPM from the medical storage cabinet. (*See id.*).

On February 14, 2017, Plaintiff went to the infirmary and requested CPM medication, which Plaintiff states nurses are allowed to give over the counter if they "see the need." (*Id.* ¶ 38 (quotation marks omitted)). A fellow inmate, Joseph Collins, was also in the infirmary at that time and observed "bloody sores" on Plaintiff's body. (Collins Aff. 1). According to Mr. Collins, upon hearing Plaintiff's request, Defendant Gonzalez screamed at Plaintiff, "No, you can't have nothing!" (*Id.* (quotation marks omitted)).[16] Gonzalez refused to provide Plaintiff CPM because

---

[16] The Court considers this statement as non-hearsay, as it constitutes an opposing party's statement under Federal Rule of Evidence 801(d)(2)(A).

Plaintiff was not authorized to receive it at that time.  (*See* Suppl. Med. Recs. 106).  Gonzalez then instructed another staff member to call security (*see* Collins Aff. 2–3) because Plaintiff had "lied to medical staff about his authority to receive CPM, a drug known to be abused by inmates" (Suppl. Med. Recs. 106).  Security placed Plaintiff in confinement.  (*See id.*).

Plaintiff filed several grievances in late February and early March 2017 expressing dissatisfaction with the scheduling of his follow-up appointment.  (*See id.* 107–12, 120–21).  On February 21, 2017, staff informed him he had an upcoming medical appointment.  (*See id.* 112).  On March 6, Plaintiff saw Nurse James for multiple red rashes on both arms and unrelated back pain.  (*See id.* 114).  He was prescribed Benadryl for 5 days, Motrin for 15 days, and triamcinolone ointment for 30 days.  (*See id.* 113–14).  Nurse James noted Plaintiff agreed to the treatment plan.  (*See id.* 114).

On March 8, 2017, medical staff saw Plaintiff, but he became "combative and aggressive" and was therefore escorted out by security.  (*Id.* 111, 118).  Specifically, Delgado noted he "was accusing medical of not getting his medications and speaking profanity."  (*Id.* 115).  Delgado examined Plaintiff, again explained the results of the hand biopsy indicated excoriation, provided information on his lab tests, and "prescribed medication needed."  (*Id.*).  Shortly thereafter, in denying a grievance related to his expected neurology referral, Berrios pointed out that Plaintiff had "been educated by medical staff on the process of outside consults" — that is, Plaintiff would first need to "receive an MRI prior to seeing a neurologist, as the results will be required from a neurologist."  (*Id.* 108, 120).  Berrios confirmed Plaintiff had "been approved for an MRI consult."  (*Id.*).[17]

---

[17] Plaintiff saw Berrios leaving for the day on March 18, 2017 and inquired about the neurology referral.  (*See* Pl.'s Am. SOF ¶ 41).  Plaintiff states Berrios admitted he "never should have sent Plaintiff to [d]ermatology" and "should have sent [him] straight to [n]eurology[,]" but "he had taken the easy route hoping for a quick fix[.]"  (*Id.* (alterations added)).

Plaintiff had an MRI on March 24, 2017.  (*See id.* 124).  He saw Delgado on March 27, 2017, but the MRI results had not yet been received.  (*See id.* 123).  Delgado nevertheless completed forms for a neurologic consultation at that time.  (*See id.*).  Berrios reviewed the MRI results on April 3, 2017 and prescribed Plaintiff triamcinolone ointment and CPM for 30 days.  (*See id.* 113, 124).  Those prescriptions were filled by the pharmacy on April 11.  (*See id.* 126).  A renewed DER for Seroquel was also approved in April 2017.  (*See* Med. Recs. 26; Defs.' SOF ¶ 37).

Plaintiff saw an outside neurologist on April 28, 2017 and reported "chronic nocturnal itching[.]"  (Med. Recs. 22 (alteration added)).  The neurologist observed "[s]cattered excoriated papules on [Plaintiff's] extremities and trunk."  (*Id.* (alterations added)).  Although Seroquel is not a formulary drug in the prison, Plaintiff revealed he had "been paying for the medication himself" for several weeks.[18]  (*Id.*).  He asserted Seroquel "stopped the itch and allowed the lesions to start healing."  (*Id.*).

The neurologist recommended a trial of Cyproheptadine, several labs, and a CT scan; and he recommended Plaintiff later return with the results of those tests.  (*See id.*).  Once the labs and CT scan were ordered (*see id.* 28; Suppl. Med. Recs. 161) and complete, staff determined an alternative treatment plan to the one recommended by the outside neurologist was appropriate.  (*See* Suppl. Med. Recs. 163).  Plaintiff was prescribed and restarted on Seroquel on June 30, 2017.  (*See id.* 168; Med. Recs. 26).

Plaintiff initially filed this action on July 10, 2017 (*see generally* Compl.) and filed the operative Amended Complaint on April 19, 2018 (*see generally* Am. Compl.).  As noted, Plaintiff

---

[18] Plaintiff disputes he purchased Seroquel from other inmates.  (*See* Pl.'s Resp. SOF ¶ 36; Pl.'s Resp. to Expert Rep. 48).

filed a Motion for Summary Judgment (*see generally* Pl.'s Mot.); and Defendants filed an Omnibus Motion for Summary Judgment (*see generally* Defs.' Mot.).  Plaintiff asserts Defendants' filings "do[] not even dispute the [claimed] violations" and summary judgment in his favor is therefore appropriate. (Pl.'s Mot. 1 (alterations added)).  According to Defendants, Plaintiff cannot establish the cessation of Seroquel caused his itching and sores; the medical records show manipulation and malingering; Plaintiff was repeatedly treated and given medication to alleviate his itching; and Plaintiff's claims amount to no more than a difference in medical opinion or, at most, medical negligence. (*See generally* Defs.' Mot.).  In sum, the parties' cross-motions ask the Court to decide whether the undisputed, material facts demonstrate deliberate indifference.

## II.    LEGAL STANDARD

Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits[19] show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court draws all reasonable inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023

---

[19] The Court considers Plaintiff's self-serving, uncorroborated affidavits and the non-conclusory factual statements in his responses filed under penalty of perjury.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("[N]othing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving." (alteration added)); *Stallworth v. Tyson*, 578 F. App'x 948, 950 (11th Cir. 2014) (stating factual assertions made in pleadings or responses that are either sworn or made under penalty of perjury "meet[] Rule 56's requirements for affidavits and sworn declarations" (alteration added; citations omitted)).  The Court does not, however, consider unsworn factual averments, such as those contained in Plaintiff's Amended Complaint, in evaluating the summary judgment motions.  *See McCray v. City of Homestead*, No. 18-23195-cv, 2020 WL 5264521, at *2 (S.D. Fla. Aug. 5, 2020) (citations omitted).

(11th Cir. 2000).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alteration added).

If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim, and (2) showing the Court there is insufficient evidence to support the non-moving party's case. *See Blackhawk Yachting, LLC v. Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citations omitted).  "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id.* (citing Fed. R. Civ. P. 56(c)(1); alteration added; quotation marks omitted).  The nonmoving party must supply more than a "mere 'scintilla' of evidence" to demonstrate a genuine issue of material fact. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 242).

Evidence that is "merely colorable or is not significantly probative" will not preclude summary judgment.  *Anderson*, 477 U.S. at 249–50 (citations omitted).  Likewise, "conclusory allegations without specific supporting facts" are insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citations omitted).

"Summary judgment may be inappropriate even where the parties agree on the basic facts [] but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (alteration added; citation omitted).  Where "reasonable minds might differ on the inferences

20

arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (citations omitted). Speculation or conjecture, however, cannot create a genuine dispute to overcome summary judgment. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (explaining "pure conjecture" and "unsupported speculation . . . do[] not create a *genuine* issue of fact" (alterations added; original emphasis; quotation marks and citation omitted)).

When the parties file cross-motions for summary judgment, the standard of review "does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)); *see also United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions . . . will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." (alteration added; citation omitted)).

### III.     ANALYSIS

#### A.  **Eighth Amendment Framework**

To make out an Eighth Amendment claim of deliberate indifference to a serious medical need, a plaintiff must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (citation omitted). "To succeed on a claim of deliberate indifference in the medical context, a plaintiff must satisfy an extremely high standard." *Stewart v. Lewis*, 789 F. App'x 825, 828 (11th Cir. 2019); *see also Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020) ("A prisoner bringing a deliberate-

indifference claim has a steep hill to climb."). "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent to be intolerable to fundamental fairness.'" *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (citation omitted).

Defendants do not address Plaintiff's serious medical need in their Motion. (*See generally* Defs.' Mot.). The Court therefore assumes, for purposes of summary judgment, Plaintiff's mental health and itching condition are objectively serious medical needs. Defendants instead argue that Plaintiff cannot establish the second essential element of his claim: that Defendants were deliberately indifferent to his medical needs. (*See id.*).[20] By contrast, Plaintiff contends he is entitled to summary judgment because Defendants "do[] not even dispute the [claimed] violations." (Pl.'s Mot. 1 (alterations added)).

## B. **Deliberate Indifference**

To establish deliberate indifference, Plaintiff must show Defendants knew of, and disregarded, an excessive risk to his health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both [have been] aware of facts from which the inference could be

---

[20] Defendants also argue Plaintiff cannot establish causation — specifically, that Defendants' discontinuation of Seroquel and refusal to re-prescribe it caused his itching condition. (*See* Defs.' Mot. 11–15); *see also Washington v. Yardely*, No. 18-cv-1333, 2020 WL 2231806, at *7 (N.D. Fla. Apr. 27, 2020) ("Proving causation in a deliberate indifference case requires a plaintiff to demonstrate a link between a defendant's act or omission and the excessive risk of harm, and a link between the risk of harm and the plaintiff's injury." (citation omitted)). Defendants point to Plaintiff's complaints of itching both while previously on Seroquel in 2012–2014 and after he was restarted on Seroquel in June 2017. (*See* Defs.' Mot. 12, 14–15 (citations omitted)). Defendants' expert report also indicates a lack of evidence that cessation of Seroquel causes itching. (*See generally* Expert Rep.).

Plaintiff responds that his itching in 2012 occurred after being discontinued from Seroquel; his itching in 2013 was due to a soap allergy; and he did not have the same condition in late 2017 after restarting Seroquel. (*See* Pl.'s Resp. 3, 10; Pl.'s Resp. SOF ¶ 20). He further disputes Defendants' expert report and submits he has located a "case study" linking the use of Seroquel to an itching condition. (*See generally* Pl.'s Resp. to Expert Rep.; Pl.'s Case Study Aff.).

Because the Court concludes — based on the undisputed, material facts — that Plaintiff cannot establish deliberate indifference, the Court does not evaluate the parties' arguments concerning the causation prong.

drawn that a substantial risk of serious harm exist[ed], and he must also [have] draw[n] the inference." (alterations added)).  Plaintiff must prove Defendants "acted with deliberate indifference to that need by showing (1) that they had 'subjective knowledge of a risk of serious harm' and (2) that they 'disregarded' that risk (3) by conduct that was 'more than mere negligence.'"  *Keohane*, 952 F.3d at 1266 (alteration adopted; quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)).  "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (citation omitted).  Similarly, "persist[ing] in a particular course of treatment" that is ineffective may, in certain circumstances, amount to more than mere negligence. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (alteration added; citation omitted).

Plaintiff must also show Defendants had a "subjective intent to punish," meaning they "acted with an attitude of deliberate indifference."  *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotation marks and citation omitted).  Thus, Plaintiff must demonstrate Defendants' response to his serious medical needs was so poor as to "constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice."  *Id.* (alterations adopted; quotation marks and citation omitted).

When assessing claims of deliberate indifference at the summary judgment stage, courts must "distinguish between evidence of disputed facts and disputed matters of professional judgment."  *Beard v. Banks*, 548 U.S. 521, 530 (2006).  A medical provider's decision not to pursue a particular course of diagnosis or treatment and the determination of which medication to prescribe are "classic example[s] of [] matter[s] for medical judgment[,]" the exercise of which does not violate the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) (alterations

added); *see also Monteleone v. Corizon*, 686 F. App'x 655, 660 (11th Cir. 2017); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995). Mere disagreement between an inmate and the prison's medical staff regarding the proper course of treatment does not support a finding of deliberate indifference. *See Harris*, 941 F.2d at 1505. Finally, "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) (citation omitted).

### a.  <u>Plaintiff's Claims Concerning Discontinuation of Seroquel</u>

The crux of Plaintiff's first claim arises from the discontinuation of his Seroquel prescription in late May 2015, when Plaintiff was transferred to Everglades Correctional Institution, and Defendants' refusal to re-prescribe him Seroquel until June 2017.[21]  A review of the evidence presented shows Defendants initially discontinued Plaintiff from Seroquel because a new DER was required to be submitted upon his transfer to Everglades Correctional Institution, but Defendants' review of his medical records revealed he could take other medication, which he refused to take. The records also show Defendants believed Plaintiff was malingering and did not have a medical need for psychotropic medications. Additionally, Plaintiff was regularly treated by mental health staff.

*Treatment at Everglades Correctional Institution and the SFRC*.  At a meeting with Plaintiff on June 2, 2015, shortly after he was transferred, Guertin explained to him that his prior institution "was run by a different company" so she would need to file a new DER request.  (Med. Recs. 13).  She cautioned Plaintiff there was "no guarantee of approval" and noted he was stable and "verbalized understanding."  (*Id.*).  Guertin submitted a DER for Seroquel (*see id.* 50), but

---

[21] Plaintiff laments this characterization of his first claim — insisting his complaint is not that he was denied Seroquel, but that he was denied any medication he can tolerate (*see* Pl.'s Reply 3) — but he states multiple times he "can't take anything else" except Seroquel (Suppl. Med. Recs. 14; *see also* Med. Recs. 34; Pl.'s Resp. to Expert Rep. 4).

CASE NO. 17-22705-CIV-ALTONAGA/Reid

Santiero denied it on June 5, 2015, commenting "[Y]ou must send dates [and] duration of other[] [medications]." (*Id.* (alterations added)). Consequently, Guertin "personally read all volumes of [Plaintiff's] chart" (*id.* 53 (alteration added)) and discovered he "took Risperdal and Congentin [sic] with a positive response for periods of greater than six [] months" (Suppl. Med. Recs. 13 (alteration added)). Guertin advised Plaintiff the DER for Seroquel had been denied, declined to file a renewed DER, and instead offered him Risperdal with Cogentin on several occasions, which Plaintiff refused. (*See id.*; Med. Recs. 34, 52, 54). Guertin thus determined Plaintiff was denying medical treatment. (*See* Med. Recs. 34).

At eight psychiatric follow-up visits with Guertin, Santiero, and Rivero-Guevara from June to October 5, 2015, Plaintiff continued to demand Seroquel, screamed, threatened to harm himself and staff, and threatened to continue causing institutional disturbances until his demands were met. (*See* Med. Recs. 16, 46, 51–57; Suppl. Med. Recs. 14, 25). Despite this behavior, Guertin was able to make the following assessments: Plaintiff was adequately groomed and dressed; he was alert and oriented to person, place, time, and situation; his affect was broad; his mood was angry and irritable; his thought processes were coherent; and although he reported experiencing command auditory hallucinations "all of the time," he did not appear to be responding to internal stimuli. (Suppl. Med. Recs. 14 (quotation marks omitted); Med. Recs. 51–54). Guertin further noted Plaintiff was "being manipulative [and] is med[-]seeking." (Med. Recs. 54 (alterations added)).

After being made aware of the situation on June 22, 2015 (*see id.*), Dr. Johnson administered the MFAST to Plaintiff to test for malingering (*see id.* 32). In keeping with Plaintiff's medical records showing "inconsistent and apparently exaggerated symptoms[,]" Plaintiff's score of 13 suggested he "may be feigning or exaggerating [mental health] symptoms . . . , perhaps to

obtain the psychiatric medication he demands Plaintiff's medical record showed." (*Id.* (alterations added)).  Rivero-Guevara thus informed Plaintiff "[i]t ha[d] been determined that [he] d[id] not require antipsychotic medication at th[at] time." (Suppl. Med. Recs. 13 (alterations added); *see also* Med. Recs. 16 (staff noted Plaintiff "feign[ed] psychiatric symptoms" and "manipulate[d] staff with . . . threats" in order to obtain Seroquel (alterations added))).

Likewise, when he was transferred to the SFRC in September 2015, Plaintiff displayed no signs or symptoms of psychosis, depression, or mania; but displayed "med-seeking [behavior] for Seroquel" despite there being "no justification for th[e] med[ication]." (Med. Recs. 18 (alterations added)).  After Plaintiff scored 25 on a second MFAST on September 21, 2015 and then claimed he lied on every question, Dr. Palmer concluded neither his "clinical presentation nor his M-FAST scores indicate he is experiencing psychotic symptoms." (*Id.* 19).  Plaintiff was then seen by Santiero and other mental health staff on three more occasions before he was transferred from the SFRC.  (*See* Suppl. Med. Recs. 22–23, 25).

Based on the evidence presented, no reasonable juror could find these Defendants' discontinuation of Plaintiff's Seroquel medication and decision not to re-prescribe it were based on anything other than their determinations that: (1) Plaintiff could tolerate alternative medications, and (2) Plaintiff had no medical need for psychotropic medications.

Plaintiff relies on the Eleventh Circuit's decision in *Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996), to support his argument that Guertin's refusal to resubmit a DER for Seroquel and her alternative offer to prescribe "the cheaper" Risperdal with Cogentin amounts to deliberate indifference.  (*See* Pl.'s Reply 3, 8 (capitalization omitted)).  In *Steele*, the Eleventh Circuit reversed a grant of summary judgment in favor of a doctor because the inmate provided evidence that, despite being warned by a psychiatric nurse that he "had a history of suicide attempts, and

was [] considered a potential suicide risk," the doctor chose not to promptly evaluate the inmate, provide the previously-prescribed antipsychotic medication, or offer any alternative medications. *Steele*, 87 F.3d at 1268 (alteration added; quotation marks omitted).

Plaintiff also cites *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). There, the summary judgment record contained evidence that the prison psychiatrist abruptly discontinued a prisoner's psychotropic medications on the basis of a visit of a "few minutes" and without reviewing the prisoner's medical file or conducting a mental status evaluation. *Id.* at 835. On those facts, the Eleventh Circuit concluded a reasonable jury could find the doctor provided grossly inadequate care and "realized he was doing so at the time[,]" thus exhibiting deliberate indifference to the prisoner's needs. *Id.* (alteration added).

Unlike the plaintiffs in *Steele* and *Greason*, Plaintiff was promptly evaluated by Guertin upon his transfer to Everglades Correctional Institution, who only declined to resubmit a DER for Seroquel after a thorough review of Plaintiff's medical records. In addition, Guertin offered him a combination of alternative medications, which her review indicated he could safely tolerate. (*See* Suppl. Med. Recs. 13; Med. Recs. 34). Plaintiff disputes he could safely tolerate the medications and asserts Risperdal "almost killed" him, but the document he provides to support that statement is an unverified, unsworn handwritten note Plaintiff appears to have inserted in his medical documents to accompany a record of a fall he endured due to an unspecified cause and without injury. (Suppl. Med. Recs. 10–11). Although Plaintiff was reported to have experienced "significant [extrapyramidal symptoms]" while taking Risperdal alone (*id.* 174 (alteration added)), the records make no mention of Plaintiff's tolerance of Risperdal with Cogentin, which can be used to reduce the movement side effects of antipsychotic medications.

Yet, even if Guertin was mistaken or negligent in concluding Plaintiff could safely tolerate Risperdal with Cogentin, Plaintiff has presented no evidence she denied Plaintiff Seroquel or offered him Risperdal with the "subjective intent to punish[.]"  *Taylor*, 221 F.3d at 1258 (alteration added; citations omitted); *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) ("Accidents, mistakes, negligence, and medical malpractice are not constitutional violations merely because the victim is a prisoner." (alteration adopted; quotation marks and citation omitted)).  Similarly, he provides no support for his assertion that Guertin offered him Risperdal simply because it was cheaper than Seroquel.  (*See* Pl.'s Reply 8).  Therefore, Plaintiff has failed to present disputed facts demonstrating Guertin was deliberately indifferent when Plaintiff's Seroquel prescription was initially discontinued.

Nor can Plaintiff establish Guertin, Santiero, and Rivero-Guevara were deliberately indifferent by declining to later re-prescribe Seroquel or give him another psychotropic medication. While Plaintiff disagrees with Dr. Johnson, Dr. Palmer, and these Defendants' assessment that he was malingering and did not have a medical need for antipsychotic medication, he has adduced no evidence to show their findings "were unreasonable or were a fabrication to hide an underlying true intent to cause Plaintiff harm."  *Washington*, 2020 WL 2231806, at *5. Instead, he refers to his documented history of mental illness and taking Seroquel by attaching medical records dating from 2010.  (*See, e.g.*, Suppl. Med. Recs. 62–69; *see also id.* 40 (referring to "documented psychosis" (capitalization omitted)); Med. Recs. 44 (stating he has been taking Seroquel for 13 years)).

Plaintiff's lengthy mental health battle, by itself, is insufficient to show Guertin, Santiero, and Rivero-Guevara were deliberately indifferent in determining Plaintiff did not require antipsychotic medication at that time.  Rather, and despite Plaintiff's insistence to the contrary, the

evidence shows Defendants arrived at that conclusion through their considered medical judgment. For instance, Guertin observed at several psychiatric follow-ups that Plaintiff appeared to be stable after being discontinued from Seroquel: he was adequately groomed and dressed, alert, oriented, coherent, and did not appear to be responding to internal stimuli.  (*See* Suppl. Med. Recs. 14; Med. Recs. 51–54).  And although Plaintiff later acted out and threatened to harm himself and staff, leading to a stay in a self-harm observation unit, Defendants concluded Plaintiff was being manipulative, med-seeking, and feigning psychiatric symptoms in an effort to obtain the medication he desired.  (*See* Med. Recs. 16, 18, 46, 51–57; Suppl. Med. Recs. 14, 25).  Their assessment is supported by two independently conducted MFAST examinations, which each suggested Plaintiff was not experiencing psychotic symptoms during that period.  (*See* Med. Recs. 19, 32).[22]

Furthermore, no reasonable jury could conclude Defendants disregarded Plaintiff's mental health while he was at Everglades Correctional Institution and the SFRC.  Plaintiff was seen at least 15 times by Guertin, Santiero, Rivero-Guevara, and other staff for mental health visits during the four months he was lodged at those facilities.  In sum, Plaintiff's claims come down to a difference of opinion over the proper course of treatment for his mental health needs, which is a "classic example of a matter for medical judgment."  *Estelle*, 429 U.S. at 107.  Plaintiff's mere disagreement with Defendants' determination he had no medical need for antipsychotic medication, even if that determination was wrong or made negligently, cannot support a finding

---

[22] Plaintiff's allegations that he saw Dr. Johnson write things he did not say during his first MFAST (*see* Pl.'s Resp. SOF ¶ 10) and that he intentionally "answered every question opposite" on the second exam given by Dr. Palmer (*id.* ¶ 15), even if accepted as true, are not evidence that he was in need of antipsychotic medication, nor are they evidence that Guertin, Santiero, and Rivero-Guevara were deliberately indifferent in determining he did not.

of deliberate indifference. *See Harris*, 941 F.2d at 1505. Accordingly, summary judgment in support of Guertin, Santiero, and Rivero-Guevara is appropriate.

*Treatment at Dade Correctional Institution.* For similar reasons, Plaintiff has not established Bermudez, Selem, and Heath were deliberately indifferent to his mental health needs. Plaintiff was transferred to Dade Correctional Institution on October 22, 2015. (*See* Suppl. Med. Recs. 26). He was seen by various psychiatry and mental health staff; including several times by Heath and Selem, on October 29, November 2, November 30, December 5, December 10, December 28, 2015, and January 7, 2016. (*See id.* 29–35, 38). He consistently complained about the denial of Seroquel, but at each session, staff noted he did not appear to be responding to internal stimuli, had coherent conversations inconsistent with his reports of hearing voices, and made contradictory claims of psychotic illness and having a high IQ. (*See id.* 29–35). At his visits, Plaintiff was also adequately groomed and dressed; cooperative and calm; alert; oriented to time, place, person, and situation; maintained good eye contact; and was logical and coherent in speech and thought. (*See generally id.*). Given these consistent observations, on January 7, 2016, Heath changed Plaintiff's mental health status from level S3 to level S2 (*see id.* 35), which meant he would no longer see psychiatry regularly (*see id.* 40, 180).

Plaintiff submitted several grievances throughout February and March 2016 concerning the discontinuation of Seroquel and his requests to see Selem. (*See id.* 37–40; Med. Recs. 42–43). Bermudez explained he was not scheduled to see psychiatry as a level S2 inmate, staff determined he did not need psychotropic medication at that time, and the psychology department would continue to evaluate him and assess whether a referral to psychiatry was warranted. (*See* Suppl. Med. Recs. 40, 54; *see also id.* 39 (same response by Berrios)). Plaintiff continued to be seen by his counselor at least monthly. (*See id.* 37, 52, 54).

On April 12, 2016, Bermudez, Selem, and a counselor saw Plaintiff.  (*See* Med. Recs. 35).
Plaintiff expressed frustration that he was not seen by mental health staff in the time frame he
wanted and stated that he wanted psychotropic medication.  (*See id.*).  Selem explained that
Plaintiff did not need psychotropic medications at that time.  (*See id.*).  Bermudez noted Plaintiff
was alert and oriented at the meeting, his thinking was clear and goal-directed, and his mood
irritable and frustrated.  (*See id.*).  Plaintiff evinced no sign of hallucinations and was informed he
would be seen by mental health staff as scheduled.  (*See id.*).

Plaintiff continued to be seen by counselors, therapists, and other mental health staff at
Dade Correctional Institution.  (*See, e.g.*, Med. Recs. 8; Suppl. Med. Recs. 176–77; Am. Compl.
37).  Plaintiff saw Selem in mid-July and mid-August 2016, and she conducted a comprehensive
review of his psychiatric records and complaints.  (*See* Suppl. Med. Recs. 177, 179–80).  On
September 18, 2016, Plaintiff submitted a grievance addressed to the mental health unit, asserting
he had been denied "[*his*] medication."  (*Id.* 177–78 (alteration and emphasis added)).  Bermudez
explained that Plaintiff was "receiving treatment, [which] does not automatically mean you must
be prescribed medication."  (*Id.* 177 (alteration added)).

Plaintiff was again seen by Selem for a psychiatric visit on October 10, 2016 (*see id.* 172);
and by mental health staff on October 13, November 11, December 9, 2016, and January 6, 2017
(*see id.* 97, 181–84).  Upon submitting another grievance, Plaintiff was reminded he does not see
the psychiatrist regularly because he is "a psych level 2[.]"  (*Id.* 180 (alteration added)).

On January 12, 2017, Bermudez administered another MFAST to Plaintiff.  (*See id.* 171).
With a total score of 1, Bermudez concluded there did "[n]ot appear [to be] an indication that he
was malingering, but . . . [t]here was no evidence of hallucinations or delusions."  (*Id.* (alterations
added)).  Bermudez told Plaintiff he would "[b]e seen by mental health as scheduled" and would

"continue to be observed and evaluated."  (*Id.* (alteration added)).  If staff determined it was necessary, he would be scheduled for a psychiatric evaluation.  (*See id.*).

Following this assessment, Plaintiff's monthly mental health visits continued (*see, e.g.*, *id.* 115) until a renewed DER for Seroquel was approved in April 2017 (*see* Med. Recs. 26).  Plaintiff was restarted on Seroquel on June 30, 2017.  (*See id.*).

Based on this evidence, no reasonable jury could conclude Heath, Selem, and Bermudez were deliberately indifferent to Plaintiff's mental health needs by reducing his mental health level from S3 to S2, declining to re-prescribe him Seroquel earlier, or failing to treat him, as Plaintiff alleges.  First, Plaintiff has produced no evidence Heath changed him to level S2 based on anything other than her reasoned medical judgment that he was stable and no longer needed the increased mental health attention of an S3.  Indeed, at numerous sessions between October 29, 2015 and January 7, 2016, Heath and other mental health staff consistently observed Plaintiff was logical, coherent, alert, oriented, articulate, and did not appear to be responding to internal stimuli.  (*See* Suppl. Med. Recs. 29–35).  Plaintiff supplies no evidence to dispute these findings aside from his own disagreement, but he must do more than simply "question" Heath's medical judgment to defeat summary judgment.  *Monteleone*, 686 F. App'x at 660.  Even if Heath was incorrect in her assessment of Plaintiff's mental state and psychiatric needs, such error is not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

Plaintiff has likewise failed to demonstrate that Heath, Selem, or Bermudez was deliberately indifferent by declining to prescribe him Seroquel and not scheduling him to see Selem more regularly.  His medical records upon transfer to Dade Correctional Institution indicated Plaintiff's previous providers believed he did not require antipsychotic medication at that

time, and Plaintiff regularly saw psychiatry and mental health staff — including Selem on at least

one occasion — from the date of his transfer to January 7, 2016.  (*See* Suppl. Med. Recs. 29–35,

38).  At each visit, Plaintiff appeared stable (*see id.*), such that Heath determined Plaintiff did not

need antipsychotic medications or regular psychiatric care and reduced him to an S2 (*see id.*

35).  As Bermudez explained to Plaintiff, his changed mental health status to level S2 meant he

would no longer regularly see psychiatry staff, including Selem.  (*See id.* 40, 180).

While Plaintiff alleges he did not see Selem for eight months between December 2015 and

August 2016 (*see* Am. Compl. 37), the medical records belie those allegations (*see* Med. Recs. 35;

Suppl. Med. Recs. 177, 179–80).  "Self-serving statements by a plaintiff do not create a question

of fact in the face of contradictory, contemporaneously[-]created medical records."  *Washington*,

2020 WL 2231806, at *6 (alteration added; citation omitted).  Plainly, Plaintiff was not re-

prescribed Seroquel from late 2015 through 2016[23] and did not see Selem as often as he preferred

because, in Defendants' medical judgment, he did not need either.  Based on the record, no

reasonable jury could conclude otherwise.  Certainly, Plaintiff has presented no evidence to

support any contrary inferences.

---

[23] Plaintiff's mental health records for 2017 are sparse.  The records reveal Bermudez, in his judgment,
began noticing a possible, unfeigned need for antipsychotic medication in mid-January 2017.  (*See* Suppl.
Med. Recs. 171).  A DER was approved for Seroquel in April 2017 and Plaintiff was re-prescribed Seroquel
on June 30, 2017 (*see* Med. Recs. 26), but the parties do not explain these gaps in time and the Court will
not speculate.  Plaintiff's failure to adduce any evidence to support an inference that Defendants were
deliberately indifferent during this time, causing a delay, is fatal to any such claim.  In any case, the
Amended Complaint contains no factual allegations concerning his mental health treatment during this
particular time period, let alone any allegations against Heath, Selem, or Bermudez during this period.
"Despite the liberal pleading standard for civil complains, plaintiffs may not raise new claims at the
summary judgment stage."  *Brown v. Jefferson Cnty. Sheriff's Dept.*, 806 F. App'x 698, 700 (11th Cir.
2020) (quoting *White v. Beltram Edge Tool Supply, Inc.* 789 F.3d 1188, 1200 (11th Cir. 2015); quotation
marks omitted).  Nor may a plaintiff "amend h[is] complaint through argument in a brief opposing summary
judgment."  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (alteration added;
citation omitted).

Finally, although Plaintiff disapproves of the frequency and form of his mental health treatment, the fact that Plaintiff was consistently and regularly treated by Defendants and other mental health staff undermines his claim of deliberate indifference.  Determining the "form[] of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (alteration added; quoting *Estelle*, 429 U.S. at 107).  Moreover, courts are exceedingly hesitant to find an Eighth Amendment violation "when a prison inmate has received medical care[.]"  *Waldrop*, 871 F.2d at 1033 (alteration added).  In short, Plaintiff has failed to establish Heath, Selem, and Bermudez were deliberately indifferent to his mental health needs, even if they were negligent or their assessments incorrect.

### b.  Plaintiff's Claims Concerning Treatment of his Itching, Rashes, and Lesions

Plaintiff's second claim relates to the medical treatment he received for itching and lesions he allegedly developed due to the cessation of Seroquel.  Plaintiff first complained of a rash on August 7, 2015 while he was at Everglades Correctional Institution.  (*See* Med. Recs. 1).  He was seen on four other occasions from August through October 2015 for itching.  (*See id.* 17, 45, 47, 59–60, 62).  Each time, medical staff prescribed him one or more of the following medications: Benadryl, Bacitracin ointment, hydrocortisone cream, and CPM.  (*See id.*; Pl.'s Resp. SOF ¶ 14).

After he was transferred to Dade Correctional Institution, Plaintiff reported itchiness on December 10 and December 14, 2015; late January 2016; and February 5, February 11, and February 29, 2016.  (*See* Med. Recs. 2–4, 49; Suppl. Med. Recs. 28, 42, 45–46).  At each visit, medical staff observed no rashes or lesions, and Plaintiff indicated he was not in pain at that time.  (*See* Med. Recs. 2–4).  At each visit, Plaintiff was given Tolnaftate, hydrocortisone cream,

triamcinolone ointment, CPM, or Benadryl (which he stated had effectively treated his itching in the past). (*See id.*; Suppl. Med. Recs. 28, 41–42, 49; Pl.'s Resp. SOF ¶ 18).

Berrios saw Plaintiff on March 10, 2016 and noted several abrasions on Plaintiff's body, suggesting his itching could be psychological. (*See* Med. Recs. 5; Pl.'s Am. SOF ¶ 18). Berrios prescribed Plaintiff 15 days of Benadryl and 10 days of prednisone. (*See* Med. Recs. 5; Suppl. Med. Recs. 50).

Plaintiff next presented to Delgado with complaints of generalized itching on April 20, 2016. (*See* Med. Recs. 6). Plaintiff was prescribed Benadryl for 30 days (which he reported helped), prednisone for 20 days, and Selsun Blue shampoo for 30 days. (*See id.*; Suppl. Med. Recs. 60–61).

Two days after his prescription ended, Plaintiff told Berrios he was persistently itchy if he was not taking Benadryl. (*See* Suppl. Med. Recs. 77). Berrios observed no lesions and again suspected psychological itching, so he referred Plaintiff to mental health for evaluation but did not prescribe Benadryl at that time. (*See id.*). Berrios also denied a grievance requesting Benadryl a few days later, advising Plaintiff he had an upcoming appointment to discuss a renewed Benadryl prescription. (*See id.* 188–90).

Plaintiff again saw Berrios on June 7, 2016 and requested Benadryl. (*See* Med. Recs. 61). Berrios observed no abnormalities on Plaintiff's skin, suspected psychogenic itching, ordered lab testing, and prescribed CPM for 15 days. (*See id.*; Suppl. Med. Recs. 78). On June 25, Berrios made the same observations, prescribed CPM, and referred Plaintiff to mental health. (*See* Med. Recs. 7). On July 22, after Plaintiff had been evaluated by mental health staff, Berrios's diagnosis remained unchanged, and he prescribed Plaintiff Benadryl for 30 days. (*See id.* 8).

On August 25, Plaintiff was prescribed Benadryl for another 30 days as well as ibuprofen, vitamin D3, Claritin, and Bacitracin ointment. (*See* Suppl. Med. Recs. 80). On September 9, 2016, Plaintiff reported the Claritin and Benadryl helped his itching, but that it was getting worse. (*See id.* 81). Delgado saw him on September 19, observed several lesions and "a lot of scratches[,]" and ordered a biopsy of the lesion. (*Id.* 82 (alteration added)). Delgado prescribed triamcinolone cream containing an alcohol Plaintiff believed would help, Bacitracin, and Claritin for 3 weeks. (*See id.*). The biopsy results came back on September 30 as "consistent with secondary excoriation[.]" (Med. Recs. 25 (alteration added; capitalization omitted)).

On October 25, Plaintiff declared a medical emergency because his condition had spread to his genitalia. (*See* Pl.'s Am. SOF ¶ 23). Vigueras refused to "pull out" and evaluate Plaintiff's genitalia, but instead went to speak with Berrios. (*Id.*). He returned and relayed Berrios's instruction to Plaintiff to "[p]ut in a sick call." (*Id.* (alteration added)).

One week later, medical staff evaluated Plaintiff and "gave him a shot of Benadryl." (*Id.* ¶ 23a). On November 11, Delgado again examined Plaintiff, explained the findings of the biopsy report, and diagnosed him with neurodermatitis and excoriation — although Plaintiff was "reluctant to accept [the] diagnosis." (Med. Recs. 9 (alteration added)). Delgado prescribed CTM for 30 days, Selsun Blue, triamcinolone, and prednisone. (*See id.*).

When Plaintiff returned with identical complaints of itching on November 14, Delgado reiterated his diagnosis, observed Plaintiff was exhibiting "pathological behavior[,]" prescribed Bacitracin and Keflex, and instructed Plaintiff to avoid scratching. (*Id.* 10 (alteration added)). The next day, medical staff gave Plaintiff Benadryl to take in addition to the medications prescribed by Delgado, and Plaintiff agreed to the treatment plan. (*See id.* 11).

On November 28, Plaintiff approached Delgado asking for more medication, threatening litigation, and denying Delgado's diagnosis of psychological itching. (*See id.*). Noting how frequently Plaintiff had been seen and how many medications he had been given that month (including CTM that day) (*see id.*), Delgado did not evaluate him at that time (*see* Pl.'s Am. SOF ¶ 25).

On November 30, Vigueras refused to retrieve a doctor when Plaintiff initially declared an emergency (*see id.* ¶ 26); but Plaintiff was eventually seen by Berrios, who prescribed Benadryl, prednisone, Solu-medrol, Augmentin, Rocephin, and several other medications (s*ee* Suppl. Med. Recs. 89–92). Berrios also placed him in the infirmary for observation and ordered another biopsy. (*See id.*). The next day, Berrios prescribed petrolatum, Zantac, prednisone, and Benadryl. (*See id.* 93).

On December 6, the biopsy report came back consistent with a diagnosis of "picker's nodules." (*Id.* 96). Plaintiff then reported Benadryl was no longer helping and the only medication easing his itching was CTM. (*See id.* 94). On December 7, he was prescribed triamcinolone cream for 30 days, Hibiclens shower gel for 30 days, CTM for 60 days, dibucaine ointment for 60 days, and referred to a dermatologist at the next available clinic. (*See id.* 94–96).

On December 20, 2016, Plaintiff was approved for an outside consultation with a dermatologist, which occurred on January 9, 2017. (*See id.* 96–97). Berrios did not provide medication upon Plaintiff's return from the dermatologist that day. (*See* Pl.'s Am. SOF ¶ 32). On January 19, 2017, while awaiting the dermatology report, Berrios gave Plaintiff 18 CPM for his symptoms and "wrote a pass for him to get CPM at [the] infirmary" until the medications from the dermatological visit were received. (*Id.* ¶ 33 (alteration added)).

On January 24, the results of the dermatology consult came back, consistent with "picker's nodules." (Suppl. Med. Recs. 100–01). The dermatologist recommended permethrin cream, clobetasol ointment, hydrocortisone cream, and Vistaril; and advised Plaintiff should see a neurologist if his symptoms did not improve after four weeks on those medications. (*See id.* 99–101). Berrios ordered the prescriptions that day. (*See* Pl.'s Am. SOF ¶ 34). On January 31, Berrios also gave Plaintiff 6 CPM pills. (*See id.* ¶ 36). Plaintiff complained the dermatologist's recommended medication were "known to be ineffective," but Berrios declined to prescribe Plaintiff additional medication. (*Id.* ¶ 37).

On February 14, 2017, Plaintiff requested CPM from the infirmary, which Gonzalez denied because Plaintiff was not authorized to receive it at that time. (*See* Collins Aff. 1; Suppl. Med. Recs. 106). On February 21, staff informed Plaintiff he had an upcoming medical appointment; and on March 6, Plaintiff agreed to a treatment plan of Benadryl for 5 days, Motrin for 15 days, and triamcinolone ointment for 30 days. (*See id.* 112–14). On March 8, Delgado again explained the results of the biopsy and lab tests, examined Plaintiff, and prescribed additional medication. (*See id.* 115). When Plaintiff complained about the scheduling of his expected neurology referral, Berrios reminded him about "the process of outside consults" and advised he would first need an MRI, "as the results will be required from a neurologist." (*Id.* 108, 120).

Plaintiff had an MRI on March 24, 2017. (*See id.* 124). On March 27, Delgado completed forms for a neurologic consultation. (*See id.* 123). Berrios reviewed the MRI results on April 3, 2017 and prescribed Plaintiff triamcinolone ointment and CPM for 30 days. (*See id.* 113, 124). Those prescriptions were filled by the pharmacy on April 11 (*see id.* 126), and a renewed DER for Seroquel was approved that month (*see* Med. Recs. 26).

Plaintiff saw an outside neurologist on April 28, 2017 and reported "chronic nocturnal itching[.]" (*Id.* 22 (alteration added)).  The neurologist recommended a trial of Cyproheptadine, several labs, and a CT scan; and recommended Plaintiff later return with the results of those tests. (*See id.*).  Once the labs and CT scan were ordered (*see id.* 28; Suppl. Med. Recs. 161) and complete, staff determined an alternative treatment plan to the one recommended by the outside neurologist was appropriate.  (*See* Suppl. Med. Recs. 163).  Plaintiff was prescribed and restarted on Seroquel on June 30, 2017.  (*See id.* 168; Med. Recs. 26).

Upon careful review of this record, no reasonable jury could conclude Berrios, Delgado, Vigueras, or Gonzalez was deliberately indifferent to Plaintiff's complaints of itching.  To begin, Plaintiff's only claim against Gonzalez is that she refused to give him CPM on February 14, 2017, but he has not produced any evidence she denied him CPM for any reason other than the one she stated: that Plaintiff was not authorized to receive it at that time.  (*See* Suppl. Med. Recs. 106). Even if she was mistaken — and she was permitted to give Plaintiff CPM if she saw the need, as Plaintiff submits — such a mistake does not rise to the level of deliberate indifference.  *See Harris*, 21 F.3d at 393 ("[M]istakes . . . are not constitutional violations[.]" (alteration adopted; alterations added; quotation marks and citation omitted)).  Nor does the fact that Gonzalez was purportedly rude support "an inference of deliberate indifference."  *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) ("While [Plaintiff] objects to [Defendant]'s apparently brusque mannerisms, it is not a violation of the Eighth Amendment for a prison physician to consult with a prisoner concerning a medical condition in an aloof or unfriendly way.  Much more is required." (citation and footnote call number omitted)).

The record compels the Court to reach the same conclusion with respect to Vigueras. Plaintiff contends Vigueras observed "red splotches" on his skin on May 26, 2016 and commented

the condition looked like hives.  (Suppl. Med. Recs. 188).  The Amended Complaint contains no

allegations and Plaintiff has presented no evidence regarding treatment or lack thereof on this date.

Further, although Vigueras declined to personally verify Plaintiff's complaints on October 25,

2016 by "pull[ing] out" Plaintiff's genitalia (Pl.'s Am. SOF ¶ 23 (alteration added)), the record

shows he did not "disregard[] an excessive risk" to Plaintiff's health, *May v. Hetzel*, 630 F. App'x

994, 996 (11th Cir. 2015) (alteration added; citation omitted).  Rather, he conveyed Plaintiff's

reported symptoms to Berrios.  (*See* Pl.'s Am. SOF ¶ 23).  While he refused to retrieve a doctor

on November 30, 2016 (*see id.* ¶ 26), Plaintiff has not shown such refusal caused any injury as he

had repeatedly been treated in the few days prior and saw Berrios that same day.  Because Plaintiff

has failed to demonstrate a causal connection between the claimed indifference and an injury,[24] he

has not established Vigueras committed a constitutional violation.  *See Mann*, 588 F.3d at 1306–

07 (To establish an Eighth Amendment claim, a plaintiff must show "causation between that

indifference and the plaintiff's injury." (citation omitted)).

Plaintiff's claims against Berrios suffer the same fate.  He adduces no evidence that

Berrios's October 25, 2016 instruction to Plaintiff to submit a sick call request was meted out for

"malicious or sadistic" reasons or for any non-medical reason.  *Monteleone*, 686 F. App'x at 659

(quotation marks and citation omitted).  In the few preceding months, Plaintiff's skin consistently

appeared normal, with no lesions present during his appointments with Berrios; and Berrios

believed Plaintiff was experiencing psychogenic itching.  (*See* Med. Recs. 7–8, 61).  In addition,

Plaintiff's biopsy results had come back as "consistent with secondary excoriation[.]"  (*Id.* 25

(alteration added; capitalization omitted)).  The only reasonable inference supported by the record

is that Berrios believed, in his medical judgment, that Plaintiff did not need urgent, emergency

---

[24] The parties' arguments as to whether discontinuing Seroquel caused Plaintiff's itching condition, discussed in footnote 20, are irrelevant to the causation analysis with respect to Vigueras.

medical care at that time and his issues could be adequately addressed through the sick-call process.

Plaintiff also complains of Berrios's and Delgado's refusals to prescribe him medication on particular dates — specifically on May 24 and November 28, 2016, and January 9 and February 1, 2017. (*See* Med. Recs. 11; Suppl. Med. Recs. 77; Pl.'s Am. SOF ¶¶ 32, 37). As with his other claims, Plaintiff fails to establish deliberate indifference because no evidence in the record could support an inference that Berrios or Delgado denied medications for any non-medical reason. *See Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) ("A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care . . . for non-medical reasons may also exhibit deliberate indifference." (alteration added; citation omitted)). To the contrary, the medical evidence demonstrates they did not prescribe medication on those dates because they either believed he did not need it, directed another form of treatment, or because Plaintiff had already been prescribed medication. (*See* Med. Recs. 9–11; Suppl. Med. Recs. 77, 94–96, 100–01; Pl.'s Am. SOF ¶¶ 34, 36).

Yet even if Berrios and Delgado were mistaken, negligent, or committed medical malpractice on these occasions, they did not commit a constitutional violation. *See Harris*, 21 F.3d at 393. Put simply, their actions were not "so objectively inadequate that they satisfy *Estelle*'s high standard." *Taylor*, 221 F.3d at 1259.

Likewise, Berrios's decision to order a dermatologic consultation prior to sending Plaintiff to a neurologist is a classic matter of medical judgment. *See Adams*, 61 F.3d at 1545 ("[T]he question of whether governmental actors should have employed additional [or different] diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment[.]" (alterations added; quotation marks and citation omitted)). Contrary to Plaintiff's assertions, the

record is devoid of any facts indicating Berrios promised, discussed, or even considered sending Plaintiff to a neurologist before his dermatology consultation. Instead, it was Nurse James who first recommended Plaintiff be referred to a dermatologist (*see* Suppl. Med. Recs. 94–95), and the first mention of a neurology referral in fact appeared in the dermatologist's report (*see id.* 101).

Plaintiff claims Berrios later reflected and expressed he should not have sent Plaintiff to a dermatologist (*see* Am. Compl. 26; Pl.'s Am. SOF ¶ 41), but in light of the contemporaneously-created medical charts, Plaintiff's unsupported and self-serving allegation rings hollow. *See Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (no question of fact in the face of contradictory medical records). Even if true, a prison physician's hindsight opinion about an earlier medical decision does not, without more, necessarily mean he was deliberately indifferent at the time he made that earlier decision. Here, Plaintiff has not supplied "more"; there is no evidence Berrios was subjectively aware a dermatologic consult was "an easier but less efficacious" course of treatment at the time he made the referral. *Bingham*, 654 F.3d at 1176 (citation omitted); *see also Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." (alteration added)). Plaintiff has thus failed to demonstrate Berrios was deliberately indifferent to his medical needs.

To the extent Plaintiff protests the delay between his dermatologic consult and his referral to a neurologist, his claim fails. While delayed treatment may sometimes rise to the level of deliberate indifference, "the reason for the delay and the nature of the medical need is [sic] relevant in determining what type of delay is constitutionally intolerable." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted). Plaintiff's chief complaint was itchy skin, and the

record shows no undue delay.  In contrast, the record reveals at each stage, Defendants promptly took the next appropriate step and routinely provided Plaintiff medication during this period.

Specifically, Plaintiff was sent to his dermatologic consult on January 9, 2017 and was medicated until the dermatologist's report and recommended treatment plan were received on January 24.  (*See* Suppl. Med. Recs. 94–97, 99–01; Pl.'s Am. SOF ¶¶ 33, 36).  The recommended medications were ordered that day with directions to take them for 30 days, to span approximately the month of February.  (*See* Suppl. Med. Recs. 100–01).  When the medications did not help, staff promptly scheduled him for an appointment, gave him additional medications, explained the process for outside consults, and scheduled him for an MRI — a prerequisite to seeing the neurologist.  (*See id.* 108, 112–15, 120).  Plaintiff's MRI took place on March 24, 2017, and Delgado submitted paperwork for a neurology consultation on March 27.  (*See id.* 123–24).

Plaintiff was prescribed 30 days of CPM on April 3 and went to see a neurologist on April 28, 2017 for his suspected psychogenic itching.  (*See id.* 113; Med. Recs. 22).  The record therefore reflects the ordinary process of scheduling outside consultations caused any perceived delay; no evidence supports an inference the delay was due to any deliberate indifference by Defendants.

Finally, Plaintiff expresses dissatisfaction with the medications Defendants gave him to ease his itching and implies they should have prescribed him Seroquel based on his belief its discontinuation triggered his itching condition.  He claims Defendants exhibited deliberate indifference by "persist[ing] in a particular course of treatment" that was ineffective.  *Rouse*, 182 F.3d at 197 (alteration added; citation omitted).  But the record reveals Plaintiff repeatedly requested Benadryl and maintained it was helping until December 6, 2016.[25]  (*See* Med. Recs. 2–

---

[25] Plaintiff apparently told a fellow inmate the medications he was given were not helping "in the summer of 2016" (Kirkpatrick Aff. 1), but there is no evidence in the record he conveyed that to any Defendant before December 6, 2016.  To the contrary, Plaintiff told Berrios he "need[ed] his Benadryl" on June 7,

3, 6, 47, 61; Suppl. Med. Recs. 77, 81, 94, 188–89).  He then asserted CPM was the only medication that worked and, except for the period he was taking the dermatologist's recommended medications, he was repeatedly prescribed CPM and other medications until his neurology consultation and DER approval in April 2017.  (*See* Suppl. Med. Recs. 94–95, 100–01, 113–15, 124; Pl.'s Am. SOF ¶¶ 33, 36).

Plaintiff's mere preference for different medications and his apparent desire to be treated with Seroquel do not evince deliberate indifference by Defendants.  *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (the mere fact an inmate desires a different mode of medical treatment does not amount to a constitutional violation).  "Moreover, determining which medication to prescribe is generally a matter of medical judgment[.]"  *Monteleone*, 686 F. App'x at 660 (alteration added; citation omitted); *see also Ross v. Corizon Med. Servs.*, 700 F. App'x 914, 916 (11th Cir. 2017) ("The failure to administer stronger medication is generally a medical judgment that is not an appropriate basis for imposing liability." (citation omitted)).

In sum, Plaintiff's claims boil down to a difference of opinion between himself and his medical providers over the proper course of treatment.  His assertion that Defendants failed to treat his itching condition is wholly belied by the medical records, which instead show Defendants regularly treated him.  Plaintiff's obvious disagreement with Defendants' diagnoses and his wish for different medical treatment do not constitute proof of deliberate indifference.  Because the evidence before the Court falls short of demonstrating the degree of deliberate indifference required to establish liability, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.

---

2016 (Med. Recs. 61 (alteration added)), and affirmed in a sick-call request on September 9, 2016 "[t]he Claritin and Benadryl help some" (Suppl. Med. Recs. 81 (alteration added)).

CASE NO. 17-22705-CIV-ALTONAGA/Reid

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.  The Wexford Defendants' Omnibus Motion for Summary Judgment **[ECF No. 388]** is **GRANTED**.

2.  Plaintiff, Lesley Tracy Harris's Motion for Summary Judgment **[ECF No. 368]** is **DENIED**.

3.  Final judgment will issue by separate order.

**DONE AND ORDERED** in Miami, Florida, this 23rd day of April, 2021.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record:
       Plaintiff, *pro se*